The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Please be seated. We're happy to hear argument in our third case, number 17-1132. Good morning. Good morning, Your Honors. May it please the Court, my name is Dirk McClanahan. I'm from the law firm McClanahan Powers. I'm here on behalf of the petitioner in this case, Mr. Sanan Rayyan. Mr. Sanan Rayyan was the plaintiff in the underlying case. The underlying case is with regards to a wrongful termination claim for race, religion, and retaliation under Title VII. We're here today on appeal from the Court's decision to grant a motion for summary judgment as to all claims and counts. And we'd ask the Court to reverse that decision and remand the case for further proceedings. In a case like this, I think it's easiest if we start from the case with regards to race, then religion, then retaliation. Although many of the facts build upon one another and all, in many ways, interplay. Specifically with race, this case is unusual in the sense that we don't routinely, or at least I don't routinely, see cases where there is an overt act of discrimination or any evidence really to support it. In this case, we have numerous overt acts of discrimination related to race. And the first one, and most compelling reason why I believe that the Court erred in granting summary judgment on this issue, is that a third-party engineer... So again, this is in the Virginia Department of Transportation. This is a program management office. So there are a bunch of engineers who are working on advancing projects that are established by VDOT through the system so that they can eventually be constructed. So during the course of doing this, one of the engineers in this office, and it's essentially a six, depending on the time of year, six- to seven-man project management office. In this case, the terminating party who works for the Virginia Department of Transportation is Ms. Shropshire. Ms. Shropshire tells to another engineer that Mr. Rayen... When discussing Mr. Rayen, that Mr. Rayen is... I'm not going to say it necessarily in hoc verba, but based on his recitation from his deposition, is that he's a stupid, dumb Arab and that he won't be around here much longer. That comment is made roughly 14 to 20 days before Mr. Rayen is ultimately terminated in January. So again, if we're looking at an overt act, the comment is clearly racially motivated, and then she identifies him as being dumb and or from the Middle East, and specifically that he will not be around here much longer. Again, approximately 14 to 20 days before she terminates him. Some of the other overt acts of Ms. Shropshire that she notified or spoke to Mr. Rayen and specifically said this is not how we do this in our country, this isn't how we do it in America. There's other deposition testimony within the joint appendix that further indicates... That it's not how we do it in this country, it's not how we do it in America? Is that your question, Your Honor? Right. Your Honor, I think it identifies... At that point, it's focusing on the fact that Mr. Rayen is clearly and visibly not from this country. He has an accent. It's well known and established to her that she is... Well, if she says this is not how we do it in this country, maybe that's just a statement of fact that that's not how you do it in this country. Why is that discriminatory evidence? Mr. Rayen transferred from Kansas, Your Honor. This isn't a man who came directly from the Middle East or Iraq, Iran, and came directly working for VDOT, and she may have been making a general inquiry as to whether or not this is how we do it from this country. This is a man who's essentially grown up in the United States, been working in the United States, and is transferring from having worked as a project manager in Kansas. He's lived in the United States. In fact, there's no indication from his resume, which she's alleged to have reviewed, that she would have any basis to think that he's ever done any work as a professional engineer outside of the United States. So to me, that comment can only be racially insensitive in saying that you're different from me, that's not how we do it here in this country, but there's no indication that he does it differently in any other country. She would have no basis in that fact. In fact, if anything, the facts that she would have would indicate to her that he was trained in the United States, he's professionally licensed in the United States, and he was previously working in the United States in Kansas. Who was hired to replace your client? That's up for some debate, but I believe it would be a gentleman named Sir Troy Whitledge, I think is his last name. And what's his race in Ephesus? He's Caucasian, and he's Christian. Where is that in the record? In the Joint Appendix specifically, I'm unsure, Your Honor. Oh, is it in the record? That he was replaced by a Caucasian? Yes, Your Honor. To the best of my knowledge, it's up. I couldn't find it. That's why I asked you. Right. During the time before my rebuttal, I'll see if I can find it in the Joint Appendix, but I believe that it's specifically notated and identified. Initially, Mr. Rayen is not ultimately replaced by anyone. The position is just removed, and then Ms. Shropshire essentially takes the role that Mr. Northridge has, and his work is assumed by Mr. Harrison, Mr. Daniel Harrison. So the reason I say I'm hesitant to say that it's Troy is ultimately later on down the line, I believe it's probably who they would say did it or a female named Ms. Catherine Coffey. But at the time of his termination, the person who immediately takes over his position is Mr. Daniel Harrison. Let me ask you this way. Do you make an allegation in your complaint, or do you argue in your brief that he's replaced by someone of a different race, gender, age, any of those things? I believe in our brief that if we don't elucidate it in the exact verbiage that you just said, that we identify it really as being Mr. Harrison. Do you argue that you don't have to demonstrate that he was replaced by somebody who was not of the same minority? Do you argue that anywhere? For purposes of the summary judgment case, the issue of whether or not he was replaced by a minority was never raised by the defendants as part of their defense. So specifically, I'm not sure that that, I don't recall that that issue was directly identified. No, I think that's a fair assessment of the record. So if we should conclude that you have, I know you think that you have made a direct case for race discrimination, but if we should conclude that you haven't, then you're within the McDonnell-Douglas standard, correct? Yes, Your Honor. And so what would you have to offer facts, what would you have to prove to prove McDonnell-Douglas' race discrimination claim? That he was from a protected class, that there was an adverse employment action, that he was… Satisfactorily performing his job. Adequate performance, and then, depending on the fourth factor, is that there was a comparable individual who is not being disparately treated or who is being treated differently. Okay, so what do you offer with respect to the fourth factor? With respect to the fourth factor, I think twofold. We make an argument tangentially that the fourth factor is not necessarily needed as identified in the Hollywood case. However, to the extent that I think we can very easily prove it, is that we compare him to a gentleman named Mr. Kirk Cupert as his comparative. Is this the person that the district court said wasn't a comparator? I'm sorry? Is this the person that the district court concluded was not a comparator? Yes, Your Honor. Mr. Kirk Cupert, the reason we argue that Mr. Kirk Cupert is a comparator is because Mr. Kirk Cupert… So, in this position, they identify you with what's called an employee work profile, and it identifies 10% of your job duty is this, 20% is this, 30% is this, 40% is this. And Mr. Cupert's and Mr. Rayen's are 70% identical. The only difference between their two positions is that Mr. Rayen has two direct subordinates. Otherwise, their function in this, what they have to do and achieve in their job is 70% identical per the evaluation system that VDOT actually prescribes. In addition, Mr. Cupert and Mr. Rayen have the same supervisor, which is Mr. Northridge, and Mr. Cupert and Mr. Rayen have the same direct reviewer, which is Ms. Shrupshire. Is your claim entirely predicated on your contention that other minority employees who perform worse than him were not fired? That's a very direct way of saying it, and I would say, ultimately, they were not marked as a below contributor, which is the path to termination, and that they were… So, there are a couple of things. You can recharacterize that any way you want to, but is that what the basis of your claim is, is that other people who were minorities or other people who performed worse or at the level that he did weren't fired? Is that your claim? At least in large part, yes. I'm trying to… In large part, that is the crux of it, I would say, that the issue here is that our client performed as good or better than his Caucasian counterparts who were rated contributors and not terminated, and our client's performance was reduced to below contributor by Ms. Shrupshire, and he was ultimately terminated for doing the same work. So, that's a critical part of the assessment, yes. There are some other issues in that our client did not have… So, our client had a workload that was substantially larger. He was doing more cases. His direct supervisor, Mr. Northridge, wanted to transfer some of the cases off of Mr. Sinan Ran. Ms. Shrupshire told him he couldn't do that. That's part of the JA and part of the issue. Another one of the direct overt acts, which I think is also part of how she was treating him differently, Mr. Harrison was assigned to train Mr. Ran in the VDOT systems. So, one of the chief complaints that they make is that Mr. Ran doesn't know the systems. Before you leave that, your argument that Mr. Ran had the largest workload, you cited pages 449, 451 in the appendix, but I didn't find… Is there any evidence other than Mr. Ran's statement that that was the fact? Mr. Northridge says it in his deposition, Your Honor, which should be part of the JA. I think he's… Mr. Northridge… Mr. Northridge, I mean, he got fired by the same person. Why isn't he the comparator here? District Court said he was. Mr. Northridge is… His EWP is different than Mr. Ran's in terms of comparing it to the 70% versus… Mr. Ran and Mr.… Let me back up. Mr. Northridge is Mr. Ran's direct supervisor. Mr. Northridge's role is fundamentally more administrative and managerial than Mr. Ran's. In Mr. Northridge's deposition, he identifies that his work at the organization is significantly less, although he does run some projects, he's not running very many. He's much more truly of the project lead in that division. Mr. Ran, for all intents and purposes, is putting out the highest volume of actually doing the project management. He's actually taking on the most number of cases. And I think, based on the fact that, and in supporting that evidence, when Mr. Ran is ultimately terminated, Mr. Harrison replaces Mr. Ran and takes over the work. So his subordinates, it takes over his… And I say subordinate, but really direct report, but fundamentally all of them are in practice reporting to Northridge while he's there. Let's go back to that comment about it's not the way it's done in America. I thought the record showed that that occurred in April or May of 2012 and that he was discharged in January of 2014. Am I right about that? My recollection is that it is possible the comment to Mr. Ran was outside of the 300 days. However, I don't, which is the America comment, that was never directly addressed in the summary judgment. And off the top of my head, I just don't remember the date. I think the date is defined fairly nebulously and that they don't attribute it. I don't know that there's ever a categorization of exactly when it occurred. Well, was a comment like that made more than just this time? Yes. It was made to Mr. Northridge as well, or he reflected that comments of a similar tenor were stated to him. And I believe in his deposition that the indication is that that would have been in the summer of the year he was terminated, which would have been January, or the year before he was terminated. So if it was in January of 2014, then that comment was made approximately somewhere between June and September of 2013. I only have one more minute, Your Honors, and we're focusing a lot on the comments. The issue and ultimately the pretext that comes from here is whether or not Mr. Rann was performing. That's their basis of termination. Was he adequately performing? In this case, we have the direct supervisor, Mr. Northridge, who was his supervisor for all of six weeks of the time that Mr. Rann was at the company. And he said specifically that Mr. Rann was a contributor. He wanted to mark him a contributor, and he was forced to change it to below contributor. So one objective party who identifies the class of his work. The second is the actual EWPs, which is the employee work profile, which say 10 percent, 20 percent, 30 percent of what you do here, you're going to be rated on and judged by as a measurable objective criteria. In this entity, in this industry as project manager, the objective factors that are meaningful in any way are whether your projects are on time and whether your projects are on budget. And in this case, the evidence shows that his projects were on time and on budget, which is the only measurable statistic. My time is up. Thank you, Your Honor. I'll speak with you on a rebuttal. Thank you. Unless you have any other questions. Thank you. Good morning, Your Honors. May it please the Court, my name is Liza Simmons. I stand here before you on behalf of the Virginia Department of Transportation, referred to as VDOT for purposes of brevity. Your Honor, this appeal concerns Mr. Rayan's claims of employment discrimination based on race and religion and his claim of retaliation. But this case is really about an employee who was given every opportunity to succeed but who was never able to adequately perform his job. Ms. Simmons, can I ask you, sort of starting at the end of your colleague's argument, as I read the record, his projects, there doesn't seem to be much dispute, that his projects were on time and on budget. And isn't that the criteria for being a project manager? No, Your Honor, that is not the criteria for being a project manager. So if your projects are not on time and not on budget, you still can be a successful project manager? No, if your projects are not on time and not on budget, that's one of the factors that comes into measuring whether a project manager is doing their job. But isn't that the ultimate? That is the goal of the project. If the person is managing the project, that would be his goal, to get the project in on time and on budget. That's correct, Your Honor, but the metrics for determining whether a project is successful is whether a project comes in on time and on budget. That's not the metrics for determining the performance of a project manager. The metrics for determining his performance are outlined in the employment work profile. Just talk to me and tell me what those are, how those are different. The employment work profile is a document that's signed. Can you just tell me what they are? I know you can read me something, but don't you know sort of what project managers are supposed to be doing that is separate and apart from getting the project in on time and on budget? Yes, ma'am. The project manager's job is to ensure that everything that has to be done to get that project ready to be advertised for bids to be constructed and ready for construction is done. But that's not a one-person job. So getting a project ready to be advertised in construction has several factors. It works with outside factors. It has to do with outside influences outside of VDOT, which play into whether or not the project is ready. It's a team effort. Mr. McClanahan referred to the project management office consisting of roughly five to six project managers. Those project managers work together often on projects to help a project come together and be prepared to be on time and on budget. So is it the state submission that, yes, his projects got in on time and on budget, but it wasn't through his efforts, it's someone else's efforts? Is that what you're saying? There's two responses. Number one, no, his projects, the projects that he worked on or managed were not always on time and on budget. So that's the first thing. Oh, I thought that that was taken in the record.  It was in our reply brief in response to our motion for summary judgment. We attached documentation that demonstrated that all of the projects were not on time and on budget. It was also in Ms. Shropshire's affidavit when she indicated that all of the projects were not on time and on budget. And Mr. Rayan actually referred to it in his brief when he alluded to Ms. Shropshire's evaluation, noting that all of the projects had come in and they were 90 percent or 70 percent or some percentage on time and on budget, but they were not 100 percent. Okay, and so was there an assessment of what his record was like compared to other people, other project managers with respect to on time and on budget? I'm sorry, Your Honor, for interfering. There's not an assessment of the percentage that the projects come in on time and on budget when measuring the performance of a project manager. Measuring the performance of a project manager is different. Ms. Shropshire testified and others testified that they often had to step in and assist, including Mr. Northridge, including some of Mr. Rayan's direct reports, to make sure that projects came in on time and on budget. So, no, this was not a one-person effort. Just because a project came in on time and on budget was not. I'm not sure whether it was a one-person effort. You were saying, and I appreciate the information, that there's information in the record that his things, his projects weren't on time and on budget. And what I was asking you, was there evidence that you offered that his records with respect to this, his efforts to be on time and on budget were less good than other project managers? That's all I'm asking you. I understand, Your Honor. I don't know that there is evidence in the record to demonstrate that his efforts were less than other project managers. You have to. So there's some other defects. So what were those other defects is what I'm asking. Is that right? That's correct, Your Honor. The lawyer relies on something else. So what's the something else? So, Your Honor, some of the defects that were pointed out was that he didn't understand the processes. He didn't understand the VDOT processes. He never grasped them. Despite the efforts of Ms. Shropshire and Mr. Northridge and others to train him, he would never understand the VDOT processes. He did not work well with the intermediary deadlines so that things happened when they were supposed to, not the ultimate project being on time and on budget, but in between and working with others outside of VDOT to make sure that things were done on time. Is that what's in these counseling memorandums and notice of improvement needed and that sort of stuff? Yes, sir. And so his deficiencies, his specific deficiencies, were raised in all of the performance documents that VDOT issued to him. They were raised even in his probationary year, in the first year, in his three-month review, in his six-month review, in his nine-month review, and in his year-end review. They raised the areas that Mr. Rayen needed to improve upon. And then in his first evaluation in October 2012, the comments were included in that evaluation that identified the areas that Mr. Rayen needed to improve upon. And then in March of 2013, when his skills still weren't adequate, he received the notice of needs improvement. And in that document, and that's part of the record as well, Your Honor, that highlighted all of the deficiencies that Mr. Rayen had that he needed to improve upon and it put in place an improvement plan. I am familiar with that part of the record. This is my question. It seems to me that his case is all sort of pitched on the fact that this one person, Ms. whatever her name is, that she had it out for him, and that his immediate supervisor, for example, Mr. Northridge, disagreed with that assessment and she forced a more disadvantaged assessment on, and she is the one that discriminates. And so having a final record come out negatively, a final assessment to him, doesn't really go to the question of whether because there is in this record a claim that his actual immediate supervisor, who is ultimately fired but not until close to the time that he's fired, thought that he was operating properly. So that's why the record is a little, it's all of those things that you said to me are in the cast of his immediate supervisor saying, yeah, no, he's doing fine. Right. I understand, Your Honor, but the record is actually very clear. Mr. McClanahan is doing what he's done from the beginning, which is attempting to mischaracterize the record, the evidence that was presented up to this point. Well, I don't think I mischaracterized it just now, so go with my characterization. But what the record does demonstrate, Judge Motz, is that Northridge testified that he never expressed any disagreement with any disciplinary measure that was taken, that he was the one who signed all of the performance documents. He also said that he said that she overrode his recommendations on some of the things. He didn't testify to that. He said that. There are other things you can say, like he's a bad employee and he was fired and he had it out for her. But the record evidence is that he had a different view of the plaintiff than you did. But that's actually not the record, Judge Motz. The record shows that at the time the decisions were made by VDOT, Mr. Northridge did not have a different understanding or a different opinion of Mr. Rayanne's performance. At the time when he issued the documents, at the time when Ms. Shropshire and he were meeting to discuss the evaluations and she was suggesting or directing that he make changes, which, by the way, she had the authority to do, pursuant to policy, he was on board with the decisions. And I'll point you to one thing in particular, the October 2013 evaluation that Mr. Rayanne claims Shropshire forced him. And that word forced, that's not shown in the record. There was never any force. Even Mr. Northridge testified that the two of them discussed the performance documents and that Ms. Shropshire suggested or directed that he make changes because she thought they should be changed. But she didn't do anything wrong. And Mr. Northridge testified that she didn't. I'm sorry. Can we all go to page JA-126 here? I mean, I don't think you have to make this argument, so I'm not sure why you are. But there's all this discussion about the October 18, 2013 assessment. Do you believe the document unfairly reflected the performance of Mr. Rayanne? Unfairly, yes. It unfairly represents his performance. I do recall this. I did not initially mark him at a below contributor level initially. Okay. Did it rise to a level that you thought Ms. Shropshire was doing something wrong? I'm going to say no. So if I said that you thought Ms. Shropshire was harsh, would you agree? Yes. So he testifies that she overruled him, at least in some instances. That's not the end of your case necessarily, but that is what he says. I understand your point, Your Honor. And I guess what I'm trying to say is the point that I need to make sure the court understands is while that's his testimony today, that was not his opinion at the time the employment decision was made. How do you know that? Because he testified to that. Mr. Northridge testified that he never expressed any ---- Well, he said that she overruled him, so he had an earlier assessment. I asked Mr. Northridge. When asked if he ever expressed ---- Where is it? This is on Joint Appendix 123. I'm sorry, 126, line 23 through 127. They're on the same page. I read you from that page. Right. Through 127, line 4. So it's after what you read. Right. But I asked him, when asked if he ever expressed disagreements with Ms. Shropshire on what she wanted to put in the October 2013 evaluation, Mr. Northridge responded, majority of the times I basically took her comments, listened to her input. To facilitate the completion of these evaluations, more often than not, I just incorporated them as opposed to argue the pros and cons of the focus of the evaluation. But what I asked you was that his claim is, maybe he's wrong, is that she's prejudiced and she, the supervisor, puts forth an assessment that his immediate supervisor did not have to begin with. Now, I take your point that his immediate supervisor didn't go to the mat and say, we have to go with my original assessment. But it seems to me that the ultimate supervisor makes the call anyway, right? Okay. He didn't go to the mat, but he already testified earlier in this same series. But the ultimate supervisor has the authority to suggest or direct changes. She worked with Mr. Rayen just as much as Mr. Northridge did, and the record reflects that. The point I was asking you about was her immediate supervisor said X. She said Y. They ultimately went with Y, but there was a disagreement. He says, the plaintiff says, that that shows that she's discriminating because she disagreed. So, yes, they disagreed. There's no doubt about that. So why don't you go from that premise and talk about why you still failed? Well, let me ask you this. I thought that Northridge sent three separate counseling memos to him about deficiencies. He did. And over what period of time was that? He received those written counseling memorandums in June, in August, and, I believe, July of 2013, before he received the October 2013 evaluation. And Mr. Northridge- The October 13 evaluation went one step further, right? And that's why Northridge said he wouldn't have done that. Well, Mr. Northridge agreed that Mr. Rayen had performance issues the whole time. He just didn't agree with the-they may have disagreed on the type of discipline issue. Right. But Mr. Northridge agreed that there were performance issues with Mr. Rayen. Right. And, Your Honor, before I move on, Mr. Northridge also sent an email to HR indicating that he agreed and concurred with the changes made by Ms. Shropshire to the 2013 evaluation. That was his opinion at the time the decisions were made. So what he says now is inconsistent with everything that he said and did at the time the employment decisions were being made. But nonetheless, even if- If your case-I'm just trying to get you off that because I don't think your case hinges on that. Okay. Maybe it's not so persuasive in the record. Okay. And the-I'll move on, Your Honor. Mr. McClanahan argued, and you asked him, if this was about-if this was a similarly situated analysis. Was he claiming that he was treated worse than others that were doing the same job? And VDOT argues that there was no one doing the job that Mr. Rayen was doing. Mr. Rayen stipulated in his own facts, which are part of the record, that he was the only one in that position, that the other three project managers that reported to Mr. Northridge were different than he was. And the EWPs that he refers to demonstrate that his job was different than his position. He was the only one that had two direct reports. But in addition to that, he was the only one of the four project managers that was a licensed engineer. He was the only one of the four who had a different title on the EWP than the other project managers. He was the only one who handled more complex projects than the other three project managers. And he supervised. If we accept what you're saying, that there's no comparator, then what? There is no comparator. What I suggest is that, number one, he hasn't- Excuse me. I'm sorry. Are you suggesting that you can't make out a race discrimination claim without a comparator? I'm not suggesting that, because I know that you can. However, he has made the issue that his allegations are that he was treated differently than other people, not in the protected class. And so it's his burden then to identify a person that's a similarly situated individual. And I don't think he can do that. So I don't believe that he can establish a prima facie case of race discrimination, because he hasn't established that his job performance was adequate, or that there was a similarly situated person outside of the protected class that was treated better than he was. Well, the district court used Mr. Northridge as a comparator. Was that erroneous? I think the district court was correct in saying that the closest comparator would have had to have been Mr. Northridge, because, again, the group that we look at is the group of project managers that consisted of Ms. Shropshire, Mr. Northridge, Mr. Rayan, and then the two direct reports, who were initially Robert Stravell and Daniel Harrison, and then Robert Stravell left and Renee Harris came on very late in the game. That comprised the project management office. And of those people, the one closest to Mr. Rayan was Mr. Northridge. And Mr. Northridge, of course, was a white male. And Mr. Northridge was supervised by Ms. Shropshire, and the record demonstrates that she treated him the same way. And, in fact, Mr. Northridge was two seconds from being terminated and resigned while he was on his own performance reevaluation. With regard to the retaliation, I don't have much time left, Your Honors. With regard to the retaliation, we argue that Mr. Rayan failed to demonstrate that he engaged in protected activity, and he failed to establish a causal connection between the protected activity and his termination. The record demonstrates that while he included a statement in his grievance to the October 2013 evaluation, the statement only read, discrimination or retaliation by immediate supervisor. It didn't reference Title VII. It didn't identify the type of discrimination. In fact, no one knew, and it was forwarded on to Civil Rights, and the affidavit of Ms. Talley, which is in the record, demonstrates that she met with Mr. Rayan immediately to determine what his claims of discrimination were. And when she spoke with him, the only claims he had concerned his performance and his disagreements with the performance evaluation. And once she went through the protected classes and tried to determine what his discrimination claims were, and what his protected class was, she came to the conclusion that he didn't have any, and that, in fact, he identified as a white male when he spoke with her. And based on the fact that he couldn't even identify in a protected class or have any claims of discrimination, that was closed, and that review was, the grievance was returned back to be addressed on the merits of the review. The merits of the performance evaluation. So there never was a protected activity, because he never made a discrimination claim pursuant to Title VII or 1983 or anything. He never did have that protected activity. Even if he did, there was no causal connection, and, Your Honor, if you would permit me to read. Okay. Even if he did, there was no causal connection, because he was already on his 90-day reevaluation plan, and had already been informed that he would be terminated in 90 days if his performance didn't improve. And that was before he even made the generic, vague claim of discrimination. Your Honor, I believe the religious claim is waived for the reasons stated in the brief. I'll stand on my arguments for the remaining, and unless the Court has any other questions. No, thank you very much. Okay, I would respectfully request that it affirm the ruling of the District Court. Thank you. Good morning again, Your Honors. Let me ask you before you get started, because we've had some discussion about this, that Mr. Rayon was on time and on budget. And as I read your brief, you cite JA-443 as an admission by Ms. Shropshire that that was the case. But it looks like to me when you look at that page that they're talking about a Mr. Strevel, not Mr. Rayon. What's the line, Your Honor, on 443? Well, JA-443 is what you reference in your brief. So, Your Honor, the page is skipped at the top. It's 139, then 141. Right, and they're talking about Mr. Strevel? No, but they were on 139, but we really don't know what's happened in 140, for example. We don't put that in the record. But the rest of 443 is all about Mr. Strevel and his scheduling difficulties. The top of 141, Your Honor, is with regards to Mr. Rayon specifically. And how do we know that? Because the rest of the questions on that page that seem to refer back to that all deal with Mr. Strevel. Well, we'll look that up later on. I don't want to take any more of your time. Okay. Starting with counsel's argument, just the most recent one she was making with regards to retaliation, since we didn't previously discuss it. The argument that Mr. Rayon has not engaged in a protective activity I think is entirely without merit. This isn't a case where he may have said something to a supervisor and there's no record of it. He filed a grievance for discrimination. It was investigated and reviewed. He sent an email to HR that there was discrimination. The idea that they can say that whether or not that I think is meaningless in the eyes of law and that he engaged in a formal protected activity by filing a grievance, checking the box, discrimination. In terms of the temporal proximity to that case, that action was taken 48 days before he's terminated. There's many cases within the confines of the Fourth Circuit and Virginia law that indicate that several months may be a temporal proximity. Certainly, 48 days is a temporal proximity to check the box and a causation piece of that. With regards to, jumping back again, I apologize for being a little bit out of continuity, a really big factor here is on time and on budget. That's why we're trying to nail that down. So where do we find the evidence of that in the record? This is the only spot you have? When you say only spot you have, Your Honor, I'm not sure what page you're referring to. My colleague just asked you about the spot and we're not sure because you left off 440. I think it's 440. You go from 439 to 441. So we don't know who's being referred to. Is there some other place in the budget where we can find an admission that he was on time and on budget? Never mind. You don't know his spot. You told me it was critical, so I thought maybe you had a record reference. Prior to their reply brief, this issue, to my knowledge, was not much in contest. The facts that we would have asserted as identified by Mr. Ray and never challenged by them, but for them trying to put facts into their reply brief, which, again, in separate documents I don't think are before the court or properly reviewed. The issue was that Mr. Rayen was on time and on budget. What about all these documents at page 522 to 529? Are those the things that were attached to their reply brief in the district court? Yes, Your Honor. So I think they were attached to the reply brief in the district court. Is that right? Yes, Your Honor. So prior to this, and obviously we have numerous disagreements with the nature of those documents that we were not afforded the opportunity to present during the summary judgment motion because they were attached to the reply brief. Ultimately, the position, I think in Mr. Rayen's deposition, taking that for what it will, is that he was, in fact, on time and on budget. In addition, Mr. Rayen, Your Honor, my time is up. May I have an additional minute just to finalize that? Yes. Principally here, the issue is whether or not Mr. Rayen was operating on time and on budget. We've asserted, and I think to the extent that their motion for summary judgment, which was granted dismissing our case, does not identify or articulate that in any way or really contradict it aside for their reply brief. I would assert that it is, in fact, he was on time and on budget. And importantly here, Ms. Shropshire is commended in her performance evaluation of that same year for hitting, going above and beyond the target marks that she was supposed to hit. How does that help you? Because Mr. Rayen is doing the most complex cases and he's doing more cases than anyone else. That's identified in Mr. Northridge's deposition. So what's happening is that there's another person. The only admonishment she gets in that report is that the people who are doing essentially the housing projects aren't quite hitting the targets. There's only one individual who does that as identified in the locally administered projects, only one individual who does that, which is Kirk Hubert. Kirk Hubert is rated contributor. In fact, he's the only person, per Northridge's deposition, that's ever identified by Ms. Northridge as having influence to being rated as a. Okay, you were just going to finish up though. I'm sorry. Thank you very much. We will come down and greet the lawyers and then go to our last case. Thank you, Your Honor.
judges: Diana Gribbon Motz, G. Steven Agee, Henry F. Floyd